## THE CITY OF ANSONIA *vs*. THE ANSONIA WATER COMPANY.

Third Judicial District, New Haven, June Term, 1924.
WHEELER, C. J., BEACH, CURTIS, KEELER and KELLOGG, Js.

The well-established rule that rates fixed by contract between a public service corporation and its customers may be modified by the State in the exercise of its police power without violating the constitutional prohibitions against impairing the obligation of contract or taking property without due process of law, applies with equal force to a contract of that nature when a municipality is a party thereto except in two classes of cases: *first*, where the State, by constitution or statute, has expressly surrendered to the municipality in clear and unequivocal language its power to regulate rates and, *second*, where the public service corporation has derived its franchise from a municipal ordinance specifying the maximum rates for a given term.
The charter powers of the City of Ansonia "to make, maintain, and

regulate public hydrants, cisterns, wells, pumps, and watering troughs, and to provide the same with water," and to contract in writing for work and supplies "under such regulations as the Board of Aldermen may by vote direct," cannot be construed as a delegation by the State of its power to regulate water rates.

The power to modify rate-fixing contracts is a necessary incident of the power to make rates; therefore, Chapter 328 of the Public Acts of 1921, purporting to confer upon the Public Utilities Commission the power to modify such contracts, and by its terms retroactive, was merely declaratory of a power already possessed by the Commission under its general rate-making authority granted in 1911 (General Statutes, §§ 3635, 3636).

Argued June 3d—decided June 30th, 1924.

APPEAL by the plaintiff from an order of the Public Utilities Commission fixing the maximum water rates to be charged by the defendant after January 1st, 1923, taken to and reserved by the Superior Court in New Haven County, *Webb, J.,* upon an agreed statement of facts, for the advice of this court. *Superior Court advised to dismiss the appeal and affirm the order of the Public Utilities Commission.*

On May 18th, 1918, the City of Ansonia and the Ansonia Water Company, a private water company specially chartered by the General Assembly, entered into a contract in writing, providing for the maintenance by the water company of ninety-four hydrants for fire protection for the term of ten years from January 1st, 1918, at the agreed rate of $25 per year for each hydrant. There is also a provision for the installation by the water company of additional hydrants at the request of the city, to be paid for on the same basis. The contract also provides that the city may use water in public buildings at the minimum quarterly rate charged by the company to all consumers. Shortly before December 31st, 1919, the company proposed to charge rates in excess of those fixed by the contract, and upon the petition of the city, and hearing thereon, the Public Utilities Commission decided that

the rates in force prior to January 1st, 1920, be re-established, without prejudice to the water company making another application for an increase of such rates, in case the then existing high increased costs to which the company was subject should continue until the end of the calender year 1920. Thereafter the water company, on April 15th, 1922, petitioned the Public Utilities Commission for an increase of rates asking that the commission prescribe such rates as should be just and reasonable and adequate. Acting on this petition of the water company, the Public Utilities Commission, after an exhaustive inquiry into the valuation of the company's plant, and all existing conditions of costs and service rendered, held that the company was entitled to a return of at least six per cent on a valuation of $700,000, or $42,000; that the present rates showed a net income of $31,000, or a deficit of the fair net return of $11,000; and upon that basis, that the company was entitled to an additional gross revenue of $16,000. Referring to the contract rate of $25 per hydrant, the commission found that under it the city was paying only $2,700 for a service fairly worth $9,250, that the contract rate was much less than the cost of service, and was "discriminatory and less than just, reasonable and equitable to enable the company to provide properly for the public convenience, necessity and welfare." The commission fixed an increased schedule of maximum rates to be charged by the company to all consumers, and a special rate for fire service based on the size of the mains connected with the fire system plus a nominal charge of $10 a year for each hydrant; amounting, for the one hundred and eight hydrants then in service, to approximately $9,100 per year. The city protested against the increased rate for fire service on the ground that the water company was bound by the contract;

that the commission had no jurisdiction to change or modify the terms thereof, and that Chapter 328 of the Public Acts of 1921— authorizing the commission, upon finding that "any rate or rates of any public service company chartered by or organized under the laws of this State exist or are charged pursuant to charter, contract or any agreement or understanding, and are in whole or in any respect discriminatory or more or less than just, reasonable and adequate to provide properly for the public convenience, necessity and welfare"; to "determine and prescribe just and reasonable maximum rates"—was void and of no effect and in conflict with the contract clause of the Constitution of the United States. From the order of the commission the city appealed to the Superior Court, and in that court the cause was reserved for the advice of this court upon a stipulation which includes an admission of the justice and reasonableness of the findings of the commission as to the valuation of the water company's plant, the rate of return thereon, and that the contract rates for fire service are discriminatory and less than just, reasonable and equitable to enable the water company to properly provide for the public convenience, necessity and welfare.

The questions reserved for the advice of this court are as follows:

1.  Whether Chapter 328 of the Public Acts of 1921 violates § 10 of Article First of the Constitution of the United States or Article 14th of the Amendments to said Constitution.

2.  Whether said decision of the Public Utilities Commission ordering rates to be charged the appellant by the respondent are different than those provided for in Exhibit C deprives the appellant of its property without due process of law or impairs the obligation of said contract.

3. Whether Chapter 328 of the Public Acts of 1921 was retroactive and empowered the Public Utilities Commission to order rates to be charged the appellant by the respondent different from those provided for in Exhibit C, said Exhibit C having been executed prior to the passage of said Act.

4. Whether or not The Ansonia Water Company was estopped from petitioning the Public Utilities Commission for an increase in rates in view of the fact that it had agreed with the respondent on a rate and in that no other person or concern or public necessity demanded a petition for an increase in rates.

*Walter J. Walsh*, with whom was *Frederick M. McCarthy*, for the appellant (plaintiff).

*Edward M. Day*, with whom was *Harold E. Drew*, for the appellee (defendant).

BEACH, J. The stipulation on which this reservation is based expressly affirms the legality of the order of the Public Utilities Commission, and the rates thereby established, in every respect except as to the four questions of law reserved for our advice: namely, (1) whether Chapter 328 of the Public Acts of 1921 impairs the obligation of the contract of May 18th, 1918, fixing, for the term of ten years from July 1st, 1918, the rate at which the Water Company agreed to maintain hydrants for fire protection; (2) whether the order of the commission authorizing and establishing a higher rate per hydrant than that fixed by the contract deprives the City of Ansonia of its property without due process of law; (3) whether the statute in question is retroactive, and (4) whether the contract estops the Water Company from petitioning the Public Utilities Commission for a rate in excess of that which it contracted to charge during the term of the contract.

Questions one and two present the controlling issue. The Supreme Court of the United States has often held that the rightful exercise of the power of the State to regulate rates charged by public service corporations cannot be forestalled by contracts between such corporations and their customers, attempting to fix rates in advance, for a term of years. In the recent case of *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 U. S. 372, 39 Sup. Ct. 117, the court, after stating the facts, said: "Thus it will be seen that the case of the plaintiff in error is narrowed to the claim that reasonable rates, fixed by a State in an appropriate exercise of its police power, are invalid for the reason that if given effect they will supersede the rates designated in the private contract between the parties to the suit, entered into prior to the making of the order by the Railroad Commission.

"Except for the seriousness with which this claim has been asserted and is now pursued into this court, the law with respect to it would be regarded as so settled as not to merit further discussion.

"That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in *Manigault* v. *Springs*, 199 U. S. 473, 480 [26 Sup. Ct. 127], it was declared that: 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' This on authority of many cases which are cited.

"In *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 357 [28 Sup. Ct. 529], it is said that: 'One whose

rights, such as they are, are subject to State restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter.' In *Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S. 467, 482 [31 Sup. Ct. 265], this is quoted with approval from *Knox* v. *Lee*, 12 Wall. [79 U. S.] 457, 550, 551, viz: 'Contracts must be understood as made in reference to the possible exercise of the rightful authority of the Government, and no obligation of a contract can extend to defeat the legitimate government authority.' In the same report, in *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire*, 219 U. S. 549 [31 Sup. Ct. 259], at p. 567, it is said: 'There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.

"In *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S. 548, 558 [34 Sup. Ct. 364], the court said: 'It is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.' And in *Rail & River Coal Co.* v. *Ohio Industrial Commission*, 236 U. S. 338, 349 [35 Sup. Ct. 359], the state of the law upon the subject is thus aptly described: 'This court has so often affirmed the

right of the State in the exercise of its police power to place reasonable restraints like that here involved, upon the freedom of contract that we need only refer to some of the cases in passing.'

"These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the State, and the judgment of the Supreme Court of Georgia must be *affirmed.*"

The City of Ansonia does not, and cannot, dispute the authority of this and other judgments of the Supreme Court to the same effect. Its claim is that a recognized exception to the general rule exists in favor of contracts made by a municipality by express authority of the State, with public service corporations, fixing the rates to be charged by such corporations for a reasonably limited term. And further, that the contract in question falls within the exception to the general rule. Examination of the authorities referred to, so far as they are relevant, shows that the exception is narrowly confined to cases in which it clearly and unmistakably appears, first, that the State has delegated its rate-regulating power to the municipality, acting within its geographical limits, and, second, that the municipality has with equal clarity and certainty exercised its delegated power by a contract fixing the rate to be charged for a limited term. The proposition is stated as follows in *Home Telephone & Telegraph Co.* v. *Los Angeles,* 211 U. S. 265, 273, 29 Sup. Ct. 50: "It has been settled by this court that the State may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and

that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. *Detroit* v. *Detroit Citizens St. Ry. Co.*, 184 U. S. 368, 382 [22 Sup. Ct. 410]; *Vicksburg* v. *Vicksburg Waterworks Co.*, 206 U. S. 496, 508 [27 Sup. Ct. 762]. But for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power."

All the cases in which a contract between a municipality and a public service corporation establishing the rates to be charged by such corporation, has been held by the Supreme Court of the United States to suspend, during the life of the contract, the governmental power of fixing and regulating rates, divide themselves into two classes. First, those in which the State has in its Constitution or by statute explicitly conferred upon the municipality the power to establish by ordinance the rates to be charged by public service corporations operating within its limits. This class includes the following cases: *Los Angeles* v. *Los Angeles City Water Co.*, 177 U. S. 558, 20 Sup. Ct. 736; *Detroit* v. *Detroit Citizens St. Ry. Co.*, 184 U. S. 368, 22 Sup. Ct. 410; *Vicksburg* v. *Vicksburg Waterworks Co.*, 206 U. S. 496, 27 Sup. Ct. 762; *Cleveland* v. *Cleveland City Ry. Co.*, 194 U. S. 517, 24 Sup. Ct. 756; *Detroit United Ry.* v. *Michigan*, 242 U. S. 239, 37 Sup. Ct. 87. The Ohio case of *Interurban Ry. & Terminal Co.* v. *Public Utilities Commission*, 98 Ohio St. 287, 120 N. E. 831, also belongs in this class.

The second class includes the so-called "franchise contract" cases, in which the municipality, being explicitly authorized to grant franchises conferring upon persons or associations the right to use its streets for

laying water pipes, gas pipes or street-railway tracks, has by ordinance, accepted by and acted upon by a public service corporation, and so having the force and effect of a contract, granted a franchise specifying the maximum rates to be charged for the service to be rendered for a given term. In these cases the Supreme Court has held that the municipality cannot by subsequent ordinance cut down the contract rate, upon the faith of which the public service corporation has made its investment, upon the plea that it is exercising a rate-regulating power impliedly involved in the power to grant franchises. Cases belonging to this class are cited in *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 19 Sup. Ct. 77.

We have not been referred to, nor have we discovered, any decision of the Supreme Court holding that a rate-making contract between a municipality and a public service corporation may not be superseded by the rightful exercising of the rate-regulating power of the State, which does not fall into one or the other of these two classes.

In the following cases the municipality was explicitly authorized to prescribe by ordinance the maximum rates to be charged by public service corporations, but in each case the particular contract in question, being strictly construed, was held not to have fixed the rate so that it could not be changed by a subsequent ordinance. *Freeport Water Co.* v. *Freeport City,* 180 U. S. 587, 21 Sup. Ct. 493; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50; *Knoxville Water Co.* v. *Knoxville,* 189 U. S. 434, 23 Sup. Ct. 531; *Puget Sound Traction, L. & P. Co.* v. *Reynolds,* 244 U. S. 574, 37 Sup. Ct. 705. These cases illustrate the solicitude with which the Supreme Court resolves all doubtful cases in favor of the continuance of the rate-regulating power.

In *Milwaukee Electric Ry. & Lt. Co.* v. *Wisconsin R. R. Commission*, 238 U. S. 174, 35 Sup. Ct. 820, a Wisconsin statute authorized any municipal corporation to grant the use of its streets for street railway purposes, "subject to such reasonable rules and regulations and the payment of such license fees as the proper municipal authorities may by ordinance, from time to time, prescribe." The question at issue was as to the effect of the above quoted words; and it was held that as the statute did not unequivocally grant to municipalities the power to deprive the legislature of the right to exercise the rate-making function in the future, no irrevocable contract was created by an ordinance establishing rates of fare of the plaintiff street railway company. On p. 180, the court says: "The fixing of rates which may be charged by public service corporations, of the character here involved, is a legislative function of the State, and while the right to make contracts which shall prevent the State during a given period from exercising this important power has been recognized and approved by judicial decisions, it has been uniformly held in this court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction." And quoting from *Home Telephone & Telegraph Co.* v. *Los Angeles*, 211 U. S. 265, 29 Sup. Ct. 50, the court adds: "The surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized. . . . The general powers of a municipality, or of any other political subdivision of the State are not sufficient. Specific authority for that purpose is required."

These judgments of the Supreme Court of the United

States are decisive of the Federal questions presented by this reservation. We have no general statute conferring upon municipal corporations the right to fix rates to be charged by public service corporations operating within their limits. On the contrary, our General Statutes, §§ 3635 and 3636, confer that authority generally and without exception upon the Public Utilities Commission. No specific authority for that purpose can be found in the charter of the City of Ansonia.

The clauses of the charter relied on by the City simply authorize it "to make, maintain, and regulate public hydrants, cisterns, wells, pumps, and watering troughs, and to provide the same with water"; and further provide in general terms that all work and supplies involving the expenditure of more than $1,000 shall be contracted for in writing "under such regulations as the Board of Aldermen may by vote direct."

In the face of these decisions and of the policy of this State as manifested by §§ 3635 and 3636 of the General Statutes, it is impossible to construe these provisions as a "clear and unequivocal" surrender by the State of its rate-making power. They grant nothing more than a general power to maintain and regulate hydrants and to contract in writing for work and supplies, including water.

Questions one and two are answered in the negative.

Question three is answered in the affirmative, but by the broad terms of Chapter 128 of the Public Acts of 1911, now found in §§ 3635 and 3636, the State unreservedly delegated the exercise of its rate-making power to the Public Utilities Commission, and from the passage of that Act, the Public Utilities Commission has had, as the authorities cited amply show, full authority to regulate rates notwithstanding the prior existence of private contracts purporting to fix

continuing rates *inter partes*. The Act of 1921, though in terms retroactive, confers no new authority upon the Public Utilities Commission, but is declaratory of a power which it already possessed.

The root of the matter is that the rate-regulating power of the State is a limitation on the right to fix rates by private contract; and that therefore the rightful exercise of that governmental power cannot be said to impair the obligation of such contracts.

Question four is answered in the negative, for the reason last stated. As the parties could not by contract directly deprive the Public Utilities Commission of its delegated authority to regulate rates, neither party can indirectly accomplish that result by attempting to rest an estoppel on a contractual obligation which the commission has rightfully superseded.

The Superior Court is advised to dismiss the appeal and affirm the order of the Public Utilities Commission.

No costs will be taxed in this court in favor of either party.

In this opinion the other judges concurred.